**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| **K.G. TILE, LLC,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Case No. 20-cv-02072-SAG** |
| | * | |
| **SUMMITVILLE TILES, INC.,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff K.G. Tile, LLC ("KG Tile") filed a Complaint against Defendant Summitville Tiles, Inc. ("Summitville"), alleging tortious interference with contractual relations, tortious interference with prospective economic advantage, and defamation, ECF 1. Pending before this Court are the parties' Cross Motions for Partial Summary Judgment as to Counts I and II of KG Tile's Complaint, ECF 38, ECF 40. The issues have been fully briefed, ECF 38-1, ECF 40-1, ECF 44, ECF 45, and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons stated below, Summitville's Motion for Partial Summary Judgment, ECF 38, will be granted in part and denied in part; KG Tile's Motion for Partial Summary Judgment, ECF 40, will be denied.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

KG Tile is a family-owned business incorporated in 2006 with Kevin Gahan as its manager and sole member. ECF 40-3 at 1. KG Tile "supplies imported and domestic tile, including specialty and handcrafted tile, for personal and commercial projects." *Id.* Summitville is an Ohio-based commercial tile manufacturer. ECF 1 ¶ 2. KG Tile and Summitville have a longstanding relationship dating to Gahan's father's management of a distribution center then-owned by

Summitville, and located in Timonium, Maryland.[1]  ECF 40-3 ¶ 4; ECF 38-1 at 3.  When it was formed, KG Tile purchased the Timonium distribution center from a third party, and now operates its business from that location.  ECF 40-3 at 1.

In July, 2006, KG Tile and Summitville executed an Application for Credit and Agreement ("Credit Agreement"), authorizing KG Tile, if approved, to purchase products from Summitville on credit.  The Credit Agreement required KG Tile to provide information sufficient for an initial creditworthiness determination, and authorized Summitville to seek additional information "from time to time" as deemed necessary.  ECF 38-5.  Summitville also provided KG Tile with a document detailing its price list and its terms and conditions of sale.  In 2014, Summitville sent KG Tile an updated document with its pricing and terms and conditions ("Terms & Conditions"), which stated in relevant part that:

> All sales are made on a cash basis unless credit is extended.  Even though credit may be granted at the time of an order, the company reserves the right to require satisfactory evidence of the buyer's financial responsibility at any time before shipment of an order.  And if such evidence is not furnished, the tile order will be shipped on a cash basis only.  When credit is granted the terms are 30 days net.

---

[1]  The parties contest whether and to what extent Gahan's father was involved in securing Summitville's contract to supply tile for installation during the initial construction of the Washington Metropolitan Area's Metrorail stations.  The dispute is not material to this Court's analysis.  Summitville requests that this Court apply the sham affidavit doctrine to a paragraph in Gahan's declaration in which he claims to have personal knowledge of these events, based on stories told to him by his father.  *See* ECF 40-3.  Summitville contends that "his assertion [that the declaration] is based on his personal knowledge 'flatly contradicts' his deposition testimony" in which he stated that his knowledge of the episode was based on his father's stories, and not on his own personal knowledge.  *See* ECF 44 at 5.  At most, the discrepancies between the two accounts arise to legalistic distinctions as to whether knowledge derived from his father's stories constitutes "personal knowledge."  These slight disparities are wholly insufficient to warrant application of the sham affidavit doctrine.  *See Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999).  Summitville further posits that the same statements constitute inadmissible hearsay.  The Court does not, however, consider the statements for the truth of the matter asserted, but rather for the limited purpose of providing context as to the parties' understanding of their longstanding relationship.  *See, e.g.*, *United States v. Love*, 767 F.2d 1052, 1063-64 (4th Cir. 1985).

ECF 38-8 at 2.  The parties do not dispute that their business relationship is generally governed by the Credit Agreement and Terms & Conditions.

For several years, KG Tile operated as one of Summitville's primary tile distributors in Maryland.  ECF 1 ¶ 6.  "KG Tile obtained Summitville tile products by placing purchase orders with Summitville."  ECF 40-3 ¶ 7.  Summitville sent invoices upon shipment of its tile products, which were due in 30 days.  *Id.*  The parties agree that throughout the course of their relationship, KG Tile periodically failed to remit payment within a 30-day period.  Summitville's Detailed Historical Aged Trial Balances indicate that between 2006 and 2018, KG Tile failed to pay approximately 55 of 156 (or roughly 35%) of invoices within 30 days.  *See* ECF 40-7.  Of these late invoices, seven invoices—including one in 2017, and six in 2018—were not paid within 90 days.  *Id.*  According to this Court's calculations, the average amount of an overdue invoice between 2006 and 2018 was roughly $2,200.  *Id.*  For its part, KG Tile's records show over 100 instances between 2010 and 2019 in which it did not pay an invoice within 30 days.[2]  Summitville occasionally inquired as to the status of the overdue payments.  For instance, on January 18, 2018, Summitville emailed KG Tile that "$5,652.85 will be over 90 days at the end of January.  We need a payment to get this cleared up.  Total of $28,872.38 over 60 days.  Please let me know of your intentions.  Thank you."  ECF 38-4 at 111.  The next month, on February 1, 2018, Summitville emailed, "Kevin [Gahan], we have not received any checks yet, and I understand they are trying to ship Order No. 126379.  The account is on hold until we get caught up.  We lose borrowing

---

[2] KG Tile contends that the discrepancies between its and Summitville's figures are attributable to the fact that "Summitville's Detail Historical Aged Trial Balances only account for the payments due as of the time the reports were run (usually year-end) so they do not capture all the times when KG Tile paid an invoice past 30, 60, or 90 days."  ECF 40-1 at 3 n.3 (citing ECF 40-4 (Ex. 2 - Webb. Dep. at 91-92, 95-96)).

availability from our bank if an account is over 90 days." *Id.* at 112. KG Tile replied that it would remit payment within the next two weeks. *Id.*

In May, 2018, the Washington Metropolitan Area Transit Authority ("WMATA") announced a large project to demolish and rebuild twenty outdoor Metrorail stations in Maryland and Virginia (hereinafter referred to as the "WMATA Project"). ECF 1 ¶ 11; ECF 40-1 at 4. The initial phase, involving six stations, occurred in the summer of 2019 ("Initial Phase"). ECF 1 ¶ 12. For the Initial Phase, WMATA's general contractor, Kiewit Infrastructure Company ("Kiewit"), subcontracted with two masons, R. Bratti & Associates ("Bratti") and Firvida Construction Corporation ("Firvida"), to provide and install Summitville slip-resistant tile at the six renovated stations. *Id.* ¶ 13. In December, 2018, Bratti and Firvida each sent purchase orders to KG Tile, requesting delivery of the Summitville tile and related supplies for the Initial Phase. ECF 40-3 at 42-44. KG Tile received and acknowledged those purchase orders and placed corresponding purchase orders with Summitville. *Id.* at 44-48.

In March, 2019, Kiewit, Firvida, KG Tile, and Summitville held two days of meetings at Summitville's Ohio headquarters. *Id.* ¶ 14. In the short term, Kiewit asked whether additional tile could be supplied for the mezzanine areas of the initial six Metrorail stations ("the Mezzanine Phase"). *Id.* KG Tile and Summitville responded that they could fill the orders for the Mezzanine Phase if Bratti and Firvida submitted purchase orders accordingly. *Id.* ¶ 15. KG Tile contends that during these meetings, Kiewit stated its intention to keep ordering Summitville tile through KG Tile, provided that the tile supply and installation continued to go smoothly. *Id.* ¶ 14.

On April 12, 2019, Bratti sent KG Tile a purchase order for tiles to be used in the Mezzanine Phase, which it referred to as a "supplement" to its Initial Phase purchase order. *Id.* at 49. In its purchase order, Bratti requested 51,000 square feet of Summitville tile; the total amount

owed to KG Tile under the purchase order was $500,981.23.  *Id.* at 50.  On that same date, Firvida

also sent KG Tile a purchase order for delivery of 28,000 square feet of tile for the Mezzanine

Phase, which Firvida referred to as a "change order."  *Id*. at 51-52.  The total amount Firvida owed

to KG Tile for the purchase order was $270,107.29.  *Id.* at 53.  KG Tile acknowledged receipt of

Bratti's and Firvida's purchase orders (hereinafter referred to as Bratti/Firvida Purchase Orders).

*Id.* at 50, 53.  On April 13, KG Tile placed two purchase orders with Summitville for the Mezzanine

Phase tile, valued at $260,080, and $138,609.90, respectively; the total amount owed by KG Tile

to Summitville for both purchase orders was $398,689.90 (hereinafter referred to as "Mezzanine

Phase Purchase Orders").[3]  *See id.* at 54-57.  Thus, KG Tile expected a profit of approximately

$372,398 from the Mezzanine Phase Purchase Orders.[4]  *Id.*  Summitville acknowledged receipt of

the Mezzanine Phase Purchase Orders.  *Id.* at 55, 57.

Summitville began shipping the Initial Phase tile to KG Tile, accompanied by

corresponding invoices, in April, 2019.  ECF 1 ¶ 27; ECF 40-3 ¶ 18; ECF 40-1 at 9.  KG Tile

timely paid the first nine of these invoices.  ECF 40-3 ¶ 18.  In or around mid-May or early June,

2019, however, KG Tile fell behind on payments due to Summitville for Initial Phase tile.  *Id.*  On

May 17, 2019, KG Tile emailed Mark Webb, Summitville's Chief Financial Officer, stating "[c]an

---

[3] The term "Mezzanine Phase Purchase Orders," refers only to the purchase orders placed by KG Tile to Summitville on April 13, 2019.  The corresponding purchase orders placed by Bratti and Firvida with KG Tile for the Mezzanine Phase are, by contrast, referred to as Bratti/Firvida Purchase Orders.

[4] The Court reached this figure by subtracting the $398,689.90 owed to Summitville from the $771,088.52 that Bratti and Firvida collectively owed to KG Tile.  In its declaration, KG Tile estimated its profit to be $380,028.62.  ECF 40-3 ¶ 33.  The discrepancy apparently derives from the fact that KG Tile calculated its total payment owed to Summitville for the Mezzanine Phase Purchase Orders to be $391,059.90, *see* ECF 1 ¶ 25, and not $398.689.90 as determined by this Court from the summation of Bratti/Firvida Purchase Orders for $260,080 and $138,609.90. Although this Court may ultimately need to resolve these discrepancies regarding KG Tile's estimated profit, the disparities are not relevant to the issues presented in the parties' motions.

you apply KG deposit to inv#1246249 and take the discount as well?  [I]n a few more weeks we will send you another deposit to put in our account.  I hope this can work out." ECF 40-18 at 5. In response, on June 11, 2019, Webb wrote, "I was thinking the payments were going to be quick and you would take the cash discount?  Are they holding you up?" *Id.* at 4.  On June 17, 2019, Webb emailed KG Tile stating "$92k over 30 days . . . let us know." *Id.*  KG Tile responded that it would remit payment the following day. *Id.*  On July 1, 2019, Webb sent KG Tile the following email, "we now have $140,000 over 30 days, and nearly $300,000 outstanding.  We need a big check before Friday." *Id.*  The same day, KG Tile informed Webb that it was waiting for its bank to process a $100,000 credit card payment that should have been processed more than 10 days ago, and that it would remit payment shortly thereafter. *Id.*  The next day, on July 2, 2019, KG Tile told Summitville that it anticipated the bank would make its funds available by the end of the day. On July 3, however, after Webb again inquired as to the status of the payment, KG Tile replied that administrative issues with the bank had not been resolved. *Id.* at 2.  Later that day, Bruce Johnson, Summitville's President, emailed KG Tile, writing, "This is absolute bullshit.  We go through all of the Bullshit to get material out and on time, we are NOT going to go through this crap of delayed payments.  I don't know how in the Hell PNC can hold money.  If it was me, I would go to the bank and withdraw everything in my account right now…Bullshit….Bruce." *Id.* at 1.  KG Tile replied that it expected the issue to be resolved by that Friday, July 5. *Id.*

On a conference call on July 16, 2019, before Summitville had shipped or invoiced any Mezzanine Phase tile, Summitville informed KG Tile that it was cancelling the Mezzanine Phase Purchase Orders.  ECF 38-1 at 18; ECF 40-1 at 7-8  On the call, Summitville also allegedly demanded that KG Tile cancel the corresponding Bratti/Firvida Purchase Orders. *Id.*  Gahan alternatively testified that he felt, ECF 38-4 at 267-68, or was told, ECF 40-3 ¶ 23, that he had no

choice in the matter.[5]  After the call, at 2:21 p.m., Bruce Johnson emailed KG Tile the following

message:

> In reference to our phone conversation this afternoon, KG Tile has a payable balance of approximately $330,000 of which $150,000 is past due and trending to be over 60 days.  There is a shipment about to leave valued at $90,000.  Please determine when your account will be within our terms and let me know ASAP.  Also, issue a statement cancelling the P.O. for the mezzanine portion of the project.  We will be contacting the G.C. and subs to issue the mezzanine P.O.  If your account gets to "current", and remains there, we will not contact the G.C. or subcontractors for payment, but it is imperative that the account remains current for the remainder of this project.  Please let me know when these issues will be satisfied.

ECF 40-3 at 69.  Roughly half an hour later, at 2:53 p.m., David Johnson, Summitville's Chief

Executive Officer, emailed KG Tile that "the attached [Mezzanine Phase] purchase orders issued

by K G [sic] Tile to Summitville Tiles are hereby voided and are not in effect.  Pursuant to our

phone conversation this afternoon, K G Tile, in turn, agrees to release the purchase orders of Bratti

and Frivida [sic], respectively, for the Mezzanine phase of the WMATA project."  ECF 38-17 at

2.  Shortly thereafter, at 3:07 p.m., Summitville emailed Kiewit, Firvida, and Bratti, stating that

KG Tile had agreed to release the Mezzanine Phase Purchase Orders, and directing Bratti and

Firvida to resubmit identical purchase orders on the same terms to Summitville directly.  ECF 40-

3 at 73.  Roughly 90 minutes later, at 4:42 p.m., Summitville contacted KG Tile to ask for details

about KG Tile's methods of pricing on tile deliveries to its customers.  *Id.* at 74.  KG Tile promptly

responded with details regarding its pricing formula.  *Id.*

---

[5] Summitville requests that this Court strike Gahan's declaration that "[w]hen I asked him what choice I had regarding the purchase order cancellations, he told me that I had no choice," ECF 40-3 ¶ 23, as flatly contradictory to his deposition testimony that "[when Summitville] [a]re you okay with that?  And my response was, what choice do I have?"  ECF 384 at 267-68.  For much the same reasons as described in note 1, *supra*, this Court does not consider these potential disparities to be so conflicting as to fall within the purview of the sham affidavit doctrine.

The following day, on July 17, 2019, KG Tile emailed Bratti and Firvida that it had not agreed to cancel its Mezzanine Phase Purchase Orders, and that all contracts with Summitville, Bratti, and Firvida remained in place.  *Id.* at 78.  On July 18, 2019, Summitville emailed Kiewit, Bratti, and Firvida, stating that that KG Tile had violated "the spirit and letter of the terms of sale that it has with Summitville Tiles, Inc. on the WMATA project," and had "jeopardized Summitville's commitment to deliver tile to the project, as scheduled, posing serious risk of triggering a $3 million per day non-performance liability on all parties associated with the project."[6]  ECF 40-9.  Bratti and Firvida subsequently cancelled the Bratti/Firvida Purchase Orders, and submitted identical orders to Summitville.  *See* ECF 40-9 ¶¶ 9-10; ECF 40-5 at 31-32. Sometime thereafter, Bruce Johnson called Edward Hanley, then-Summitville's Northeast sales representative, to inform him that Summitville had terminated its relationship with KG Tile. During the conversation, Johnson allegedly told Hanley that the relationship ended because KG Tile "was gouging the tile contractors in [*sic*] the government by charging an excessive amount for the tile." ECF 40-15 at 15.  Hanley further testified that the phone call gave him the impression that Summitville believed it had underpriced its tiles for the WMATA Project.  *Id*. at 22-24.

Bratti and Firvida are continuing to provide masonry work as subcontractors to Kiewit for the WMATA Project.  KG Tile has not, and does not expect to, receive future orders for the remaining fourteen stations in that project.  ECF 1 at ¶¶ 51-53.

KG Tile filed its Complaint in this Court on July 15, 2020, alleging that it will suffer millions of dollars in damages as a result of Summitville's (1) tortious interference with contractual

---

[6] Similarly, on July 22, 2019, Summitville sent letters to Firvida and Bratti stating that the Bratti/Firvida Purchase Orders are "properly in place directly with Summitville," and that Summitville had cancelled its purchase orders with KG Tile "due to, among other things, KG Tile's continual breaches of our payment terms."  ECF 40-9.

relations; (2) tortious interference with prospective economic advantage; and (3) defamation.  ECF 1.  Both parties now move for partial summary judgment on Counts I and II of KG Tile's Complaint.

## II.   LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of showing that there is no genuine dispute of material facts.  *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).  If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.  *Id.*  The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)).  The mere existence of a "scintilla of evidence" in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor.  *Id.* at 348 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).  Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another."  *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case.  *Id.* at 352.  The non-moving party "must produce competent evidence on each element of [its] claim."  *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671).  If the non-moving party fails to do so, "there can be no genuine

issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)).  In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.  DISCUSSION

### A.  Tortious Interference with Contract (Count I)

In Count I of its Complaint, KG Tile alleges that Summitville tortiously interfered with its contractual relations by causing Firvida and Bratti to cancel the Bratti/Firvida Purchase Orders. ECF 1 ¶ 59.  To establish tortious interference with an existing contract, a plaintiff must demonstrate:

> (1) The existence of a contract or a legally protected interest between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render impossible the performance of the contract; (4) without justification on the part of the defendant; (5) the subsequent breach by the third party; and (6) damages to the plaintiff resulting therefrom.

*Brass Metal Prods., Inc. v. E–J Enters., Inc.*, 189 Md. App. 310, 348 (2009) (quotation marks omitted); *see also Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, 2019 WL 2233535, at *19 (D. Md. May 23, 2019) (citing *Océ North America, Inc. v. MCS Servs., Inc.*, 795 F. Supp. 2d 337, 346 (D. Md. 2011)).[7]

---

[7] The parties dispute the requisite elements of KG Tile's claim in Count I.  Summitville argues that tortious interference with existing contract requires: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which

The parties do not dispute that KG Tile had existing contracts with Bratti and Firvida for the Bratti/Firvida Purchase Orders; that Summitville knew of the Bratti/Firvida Purchase Orders; that Firvida and Bratti did not perform under their respective contracts; or that damages accrued to KG Tile as a result.  The parties' chief disputes, therefore, are: first, whether Summitville's conduct was legally privileged or otherwise justified; and second, whether Summitville acted with the requisite tortious intent.  As to each of these questions, this Court concludes that there are genuine issues of material fact that preclude summary judgment for either party on Count I.  This Court will address each in turn.

### i.   Justification

"Simply because a person induces another to exercise an existing right to terminate a contract, even if that person's intention with regard to one of the parties to the contract is tortious, does not make it actionable."  *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 302 (1994).  Irrespective of a defendant's malicious intent, a plaintiff cannot establish tortious interference with contract if the defendant had a legal right or privilege to cause the third party's breach.  *Id.*; *Sharrow v. State Farm Mutual*, 306 Md. 754, 765 (1986) ("[E]ven though a third party may for his own benefit intentionally induce one party to terminate a contract with another, this alone will not render him liable in an action for tortious interference if he had a right to cause the breach since, in such circumstances, the conduct would not be wrongful or improper.").  Interference with contract is not tortious where a defendant, in good faith, asserts a legally protected interest using

---

constitutes malice); and (4) actual damage and loss resulting.'"  ECF 38-1 at 24 (quoting *D.C. Mason Builders, Inc. v. Bancroft Const. Co.*, 2015 WL 4040415, at *5 (D. Md. June 30, 2015)). This Court concludes that Summitville's proffered elements are instead an appropriate framework to assess KG Tile's claim in Count II for tortious interference with prospective economic relations. *See Macklin v. Robert Logan Assocs.*, 334 Md. 287, 298 (1994).

appropriate means.  *United Rental Equip. Co. v. Potts & Callahan Contracting Co.*, 231 Md. 552, 560, 191 A.2d 570, 574 (1963) (quoting Restatement (Second) of Torts § 773).

Summitville principally argues that because it enjoyed a legal right to terminate the Mezzanine Phase Purchase Orders, its purported intent is irrelevant and KG Tile's claim fails as a matter of law.  ECF 38-1 at 27 ("Summitville need not enter the thicket of arguments regarding any evidentiary inferences relating to intent because it is clear that Summitville's termination was justified and privileged conduct.").  Summitville provides three potential legal justifications for its conduct: (1) that it was entitled to resell tiles for the Mezzanine Phase Purchase Orders pursuant to ORC § 1302.77; (2) that it could properly suspend performance under ORC § 1302.67(A) because it requested, but did not receive, adequate assurances as to KG Tile's ability to perform; and (3) that the Credit Agreement and Terms & Conditions authorized it to withhold shipment for a delinquent credit account.  This Court finds none of Summitville's arguments wholly persuasive at this juncture, and will address each in turn.

### 1.  ORC § 1302.77

First, Summitville contends that ORC § 1302.77 justified its interference with KG Tile's respective contracts with Bratti and Firvida.  ORC § 1302.77 provides that "[w]here the buyer . . . fails to make a payment due on or before delivery . . . then with respect to any goods directly affected and, if the breach is of the whole contract . . . then also with respect to the whole undelivered balance, the aggrieved seller may: (A) withhold delivery of such goods . . . (D) resell and recover damages . . . [or] (F) cancel."  ORC § 1302.77.  Summitville asserts that because KG Tile failed to pay Initial Phase invoices due before the prospective delivery dates of the Mezzanine Phase tile, KG Tile breached the contract as a whole and entitled Summitville to the remedies outlined in ORC § 1302.77.  Of course, to avail itself of this provision, Summitville must first

demonstrate that the Initial and Mezzanine Phase Purchase Orders were a single contract.  *See* ECF 18 at 9 n.9.  Summitville asserts that there is no dispute of material fact that the Initial Phase and Mezzanine Phase Purchase Orders between it and KG Tile comprised a single installment contract. ECF 38-1 at 27-28.  This Court disagrees.

An installment contract is "one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause 'each delivery is a separate contract' or its equivalent."  ORC § 1302.70.  Summitville offers communications in which Bratti and Firvida referred to the Bratti/Firvida Purchase Orders as "change order[s]" or "supplement[s]" as evidence that the parties understood that the Initial and Mezzanine Phase Purchase Orders were a single supply contract.  ECF 38 at 26-27 (citing ECF 38-10 at 3); ECF 40-3 at 49.  This Court is not persuaded by Summitville's argument for two reasons.  First, this terminology was employed by Firvida and Bratti to describe their contracts with KG Tile.  This Court discerns no reason why third parties' characterization of their arrangements with KG Tile should control the interpretation of separate agreements between KG Tile and Summitville. Second, and more fundamentally, the terms simply cannot bear the weight Summitville places on them.  The ORC counsels in favor of a functional, not a formal interpretation; indeed, it expressly provides that an installment contract remains an installment contract, even if the parties stipulate to the contrary.  ORC § 1302.70.A. ("An 'installment contract' is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, *even though the contract contains a clause 'each delivery is a separate contract' or its equivalent*.") (emphasis added).  Accordingly, two separate contracts would remain so, notwithstanding the fact that they may be referenced in tandem.  Summitville also points to Bratti's Initial Phase purchase order to KG Tile, which stipulated that "it is important to note that this quantity does not represent the exact quantity for

the project . . . the quantity purchased vis-à-vis this Purchase Order is based on our estimate for our 4 Stations we may provide minor adjustments to quantity after Shop Drawings are completed." ECF 44 at 17 (citing ECF 40-3 at 42).  While this Court agrees that Bratti's express contemplation of additional orders weighs in Summitville's favor, it is not determinative of the contractual arrangement between KG Tile and Summitville.

Contrary to Summitville's assertions, there appears ample reason to doubt that its Initial and Mezzanine Phase Purchase Orders with KG Tile were a single installment contract.  The Initial Phase purchase orders KG Tile placed with Summitville authorized delivery of 67,285 and 31,004 units.  ECF 40-3 at 45; 47.  These quantities did not include the amounts that KG Tile subsequently ordered in the Mezzanine Phase Purchase Orders.  Rather, it appears that KG Tile separately offered to buy goods—via the Mezzanine Phase Purchase Orders in April, 2019—which were subsequently accepted and acknowledged by Summitville.  ECF 40-3 at 55-57.  It appears likely to this Court that the Mezzanine Phase Purchase Orders between KG Tile and Summitville would stand on their own as separate contracts irrespective of whether the Initial Phase purchase orders were ever placed.  *See Revere Plastic Sys., LLC v. Plastic Plate, LLC,* 2020 WL 1158725, at *7 (N.D. Ohio Mar. 10, 2020) (rejecting argument that twelve separate purchase orders formed a single supply agreement).[8]  Summitville's evidentiary showing does not allow this Court to conclude that, as a matter of law, the Initial and Mezzanine Phase Purchase Orders were a single contract.  At this stage, Summitville cannot obtain summary judgment on the basis of ORC § 1302.77.

---

[8] Summitville's reliance on *Radiance Aluminum Fence, Inc. v. Marquis Metal Material, Inc.*, 461 F. Supp. 3d 531, 535 (E.D. Mich. 2020) is unavailing.  In that case, the contract in question concerned "a blanket order for 400,000 to 500,000 pounds of aluminum to be delivered in 13 installments." *Id.*  By contrast, the Initial Phase purchase order between KG Tile and Summitville did not include the quantity or delivery dates of tiles included in the Mezzanine Phase.

## 2.  ORC § 1302.67(A)

Next, Summitville also argues that even if the Initial and Mezzanine Phase Purchase Orders were separate contracts, its conduct was still proper because it requested and was denied adequate assurances.  The ORC provides that "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return."  ORC § 1302.67.  To avail itself of § 103.267, Summitville must demonstrate that: (1) it had reasonable grounds for insecurity regarding KG Tile's performance; (2) it made written demand for assurance of KG Tile's due performance for the Mezzanine Phase Purchase Orders; and (3) KG Tile failed to provide such assurance in a commercially reasonable period of time.  *See id.*  Summitville's contention fails on the second element.

As to the first element, there can be no genuine dispute that Summitville had reasonable grounds to doubt KG Tile's performance of the Mezzanine Phase Purchase Orders according to its terms.  The circumstances giving rise to reasonable grounds for insecurity are "defined by commercial rather than legal standards," and need not be directly related to the contract in question. § 1302.67 (Cmt. 3).  A seller's expectation of due performance may be impaired when, "a buyer [] falls behind in 'his account' with the seller, even though the items involved have to do with separate and legally distinct contracts."  *Id.*  Here, it is undisputed that KG Tile had fallen farther behind in its account than at any prior point in the parties' long relationship.  As of June, 30, 2019, seven invoices to KG Tile totaling roughly $140,710 were aged over 30 days.  *See* ECF 40-7 at 14.  On that date, KG Tile's indebtedness exceeded any amount previously owed to Summitville, and certainly provided ample grounds to doubt KG Tile's prompt payment of invoices for the

Mezzanine Phase Purchase Orders. *Id.* To contest this conclusion, KG Tile contends that "Summitville did not have reasonable grounds for insecurity based on KG Tile's failure to make payments within 30 days in light of Summitville's long history of accepting post-30-day payments from KG Tile." ECF 40-1 at 29. While this Court does not dispute KG Tile's pattern of satisfying post-30-day payments, it finds KG Title's argument wholly unpersuasive in light of the amount—and not merely the number of invoices—owed to Summitville. Indeed, the total past-due amount owed by KG Tile on June 30, 2019 exceeded the amount of past-due invoices recorded in 2006 through 2018 year-end reports *combined. See id.* at 1-14 (reflecting a sum total of past-due invoices in year-end reports from 2006 through 2018 to be roughly $122,626). KG Tile's significant and mounting delinquent debt to Summitville constituted a marked departure from the parties' prior course of performance and afforded Summitville reasonable grounds for insecurity.[9]

Despite having reasonable grounds for insecurity, this Court cannot conclude as a matter of law that Summitville made a demand for adequate assurances, as is required under the ORC. When considering whether a demand for assurances was made, courts generally eschew formalistic requirements and look instead to the parties' "clear understanding that [one party] had suspended performance until it should receive adequate assurance of due performance from [the other party]." *Rocheux Int'l of N.J., Inc. v. U.S. Merchants Fin. Grp., Inc.*, 741 F. Supp. 2d 651, 674 (D.N.J. 2010) (quoting *AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167, 1170-71 (7th Cir. 1976) (alterations in *Rocheux*)). Although there is no precise formula to which a party must adhere, the

---

[9] KG Tile's reliance on *Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp.*, 944 F.2d 1131 (3d Cir. 1991) is misplaced. In *Cassidy*, the Third Circuit concluded that a defendant's acquiescence in plaintiff's consistent course of post-due payments constituted a waiver of its initial net 30-day payment terms. In that case, however, the delinquent payments were far more frequent than here; of the seventeen installment payments, the "record reveal[ed] only one month during the contract period when Cassidy paid its account before the expiration of ninety days." *Id.* Moreover, unlike the instant case, the amount of overdue payments were typical of the parties' prior relationship.

demand for assurances must be unequivocal, such that "all parties are aware that, absent assurances, the demanding party will withhold performance." *Koursa, Inc. v. Manroland, Inc.*, 971 F. Supp. 2d 765, 792 (N.D. Ill. 2013) (quoting *Puget Sound Energy, Inc. v. Pac. Gas & Elec. Co.*, 271 B.R. 626, 640 (N.D. Cal. 2002)).  Communicating concerns or insecurities, or providing notice of cancellation, is generally not sufficient to satisfy the demand requirement.  *Id.* (quoting *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 686 F. Supp. 1319, 1350 (N.D. Ill. 1988)).

Summitville's written correspondences did not clearly communicate that it would withhold performance absent assurances.  Summitville proffered emails in which it communicated concerns, requested payment, and expressed anger.  *See* ECF 40-18 at 4 (asking "I was thinking the payments were going to be quick and you would take the cash discount?  Are they holding you up?" ); *id.* (stating "We need a big check before Friday"); *id.* at 1 ("We go through all of the Bullshit to get material out and on time, we are NOT going to go through this crap of delayed payments").  Crucially, however, it offered no evidence that it communicated its intention to suspend or withhold performance unless it received adequate assurances from Summitville regarding its due performance of the Mezzanine Phase Purchase Orders.  Absent evidence of a clear understanding between the parties that Summitville required adequate assurances to continue performance, this Court cannot conclude that Summitville's conduct was justified on this basis.  Simply put, Summitville's assertion that its conduct was justified by KG Tile's failure to provide adequate assurances of its performance fails for lack of evidence that Summitville clearly demanded such assurances.  *See* § 103.267.

### 3. Credit Agreement and Terms & Conditions

Finally, Summitville asserts that its conduct was authorized under its Credit Agreement and Terms & Conditions with KG Tile. Summitville points to the parties' Terms & Conditions, which provides in relevant part that:

> Even though credit may be granted at the time of an order, [Summitville] reserves the right to require satisfactory evidence of the buyer's financial responsibility at any time before shipment of an order, and if such evidence is not furnished, the tile ordered will be shipped on a cash basis only. When credit is granted the terms are 30 days net.

ECF 38-1 at 33 (quoting ECF 38-8). Summitville derives from this language that it "was clearly authorized to terminate the Mezzanine Phase Purchase Orders." *Id.* Its conclusion to this effect, however, is neither clear nor undisputed.

Summitville's contention that its conduct was authorized by the highlighted provisions of the Terms & Conditions is belied by the record before this Court. The plain language of the Terms & Conditions authorized Summitville to revoke its grant of credit if: (1) Summitville demanded satisfactory evidence of a buyer's financial responsibility before shipment, and (2) if, in response to such request, satisfactory evidence was not furnished. *Id.* As described above, however, this Court cannot conclude on the present factual record that Summitville ever issued such a demand to KG Tile. Moreover, even assuming Summitville had tendered such a request, KG Tile's allegedly unsatisfactory response would have only empowered Summitville to revoke KG Tile's credit and ship tile on a cash-only basis.[10] The Terms & Conditions plainly do not authorize

---

[10] Summitville also appears to argue that its statement to KG Tile on July 16, 2019 that "[i]f your account gets to 'current,' and remains there, we will not contact the G.C. or subcontractors for payment, but it is imperative that the account remains current for the remainder of this project" indicates its good faith intention to ship product to KG Tile on a cash only basis in accordance with the Terms & Conditions. ECF 44 at 19 (quoting ECF 40-3 at 69). This argument is certainly not self-evident given that (1) the immediately preceding sentence stated, "Also, issue a statement cancelling the P.O. for the mezzanine portion of the project," and; (2) that it was included in an

Summitville to unilaterally cancel KG Tile's order.  Summitville's argument that "Mr. Gahan made clear that he did not have the financial resources to buy the Mezzanine Tile on a cash basis (as he was waiting for a credit card payment)" is unavailing.  ECF 38-1 at 33-34.  Summitville's mere suspicion that KG Tile would be unable to purchase tile for the Mezzanine Phase Purchase Orders on a cash basis does not justify its decision to foreclose its opportunity to do so.[11]

Simply put, this Court cannot conclude on the current record that Summitville was legally justified in terminating the Mezzanine Phase Purchase Orders.  In totality, KG Tile's evidence suffices to raise a triable issue of fact as to whether Summitville's interference was without justification.

### ii.    Intent

Next, the parties dispute whether the evidentiary record demonstrates that Summitville interfered in KG Tile's contracts with requisite tortious intent.  "To demonstrate that a defendant's actions were intentional and improper, a plaintiff must show that the defendant's conduct was 'directed at' an existing . . . economic relationship [and not] a mere 'incidental effect' of the allegedly wrongful conduct[.]"  *Interphase Garment Sols., LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 465 (D. Md. 2008) (quoting *Cambridge Title Co. v. Transamerica Title Ins. Co.*, 817 F. Supp. 1263, 1276 (D. Md. 1992) (internal quotation marks omitted)).  Tortious intent

---

email roughly a half hour prior to an email from Summitville to KG Tile stating that "the attached [Mezzanine Phase] purchase orders issued by K G [*sic*] Tile to Summitville Tiles are hereby voided and are not in effect."  ECF 38-17 at 2.

[11] Summitville relatedly contends that the parties' "agreed upon account handling practices permitted Summitville to refuse to ship the tile for the Mezzanine Phase Purchase Orders except on a cash basis," in an apparent reference to the fact that Summitville placed a "hold" on KG Tile's credit account on at least one prior occasion.  ECF 38-1 at 33.  Leaving aside that a single prior instance of a "hold" does not necessarily amount to an agreed-upon account handling practice, Summitville's argument still fails.  Summitville's authorization to require purchases on a cash-only basis does not authorize unilateral cancellation of a previously-accepted purchase order.

is satisfied where a defendant is solely or primarily motivated by a desire to interfere with plaintiff's contract.  Restatement (Second) of Torts § 767, Cmt. D.  A plaintiff may demonstrate tortious intent by evidence that defendant interfered with the purpose of injuring the plaintiff or benefitting itself at plaintiff's expense, including by influencing a third party not to deal with plaintiff.  *Océ North America, Inc.*, 795 F. Supp. at 346

KG Tile argues that Summitville "intentionally induced the termination of the [Bratti/Firvida Purchase Orders] both to harm KG Tile and benefit Summitville at the expense of KG Tile."  ECF 40-1 at 18.  To substantiate its claim, KG Tile offers testimony from Edward Hanley, Summitville's former Northeast Sales Representative, regarding his alleged conversation with Bruce Johnson shortly after Summitville terminated the Mezzanine Phase Purchase Orders. Hanley testified that—when asked why Summitville's and KG Tile's relationship ended—Johnson explained that Summitville had underpriced its tiles to KG Tile, while KG Tile in turn, "goug[ed] the tile contractors in the government by charging an excessive amount."  ECF 40-15 at 15. Johnson allegedly also stated that Summitville should have charged more for tiles purchased for the WMATA project.  *Id.*  Critically, Johnson allegedly did not cite KG Tile's delinquent payments as among the reasons for the disintegration of the parties' relationship.  *Id.*

In totality, KG Tile adduces facts sufficient to create a genuine dispute regarding whether Summitville interfered with the primary intent of benefitting itself at KG Tile's expense.  Hanley's deposition testimony, if credited, shows Summitville's animosity toward KG Tile.  It further indicates Summitville's belief that it undercharged for tile that KG Tile subsequently resold to third parties at inflated prices.  This testimony, considered in conjunction with Summitville's emails informing Bratti and Firvida that it would directly handle their resubmitted purchase orders,

could convince a reasonable jury that Summitville acted with requisite tortious intent to divert KG Tile's profit for its own benefit.

Summitville decries the sparsity of KG Tile's evidence of tortious intent. *See* ECF 44 at 10 ("Mr. Hanley's only testimony regarding Summitville purported tortious intent involves a single phone call that Mr. Hanley allegedly had with Summitville President, Bruce Johnson.").[12] To ultimately prevail, KG Tile must show that Summitville's conduct was primarily aimed at injuring, or improperly diverting, KG Tile's business, and not—as Summitville has consistently maintained—at mitigating potential harms caused by KG Tile's failure to meet its payment obligations. Though KG Tile may face an uphill battle to convince a factfinder of this point, it is not the Court's purview on summary judgment to weigh the parties' competing evidentiary showings.

Material factual disputes regarding Summitville's intentions and justifications for its conduct preclude this Court from ruling in favor of either party as a matter of law. As such KG Tile's and Summitville's Motions for Summary Judgment on Count I will be denied.

---

[12] Summitville also challenges the admissibility of Hanley's statement that he believed, based on his conversation with Johnson, that Summitville was not making enough money to cover its costs. ECF 44 at 10 ("Mr. Hanley provided no . . . reason to believe that he is aware of any financial information that would permit him to draw that conclusion. Mr. Hanley's belief 'assumes facts not in evidence' and is inadmissible speculation."). Summitville is correct that "on a motion for summary judgment, the court may only consider evidence that is admissible." *Major v. CSX Tansp.*, 278 F. Supp. 2d 597, 604 (D. Md. 2003). But Summitville only contests a single statement within Hanley's deposition testimony. While the Court declines to make any specific evidentiary rulings at this stage, even assuming the evidence the Summitville contests is inadmissible, Hanley's remaining testimony, together with Summitville's communications to Bratti and Firvida would still suffice to create a triable issue of fact.

### B.  Tortious Interference with Contractual Relations (Count II)

To prevail on its claim for tortious interference with prospective contractual relations, a plaintiff must establish the following elements:

> (1) intentional and willful acts; (2) calculated to cause damage to the plaintiff[] in [its] lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

*Ultimate Outdoor Movies, LLC*, WL 2233535, at *27 (D. Md. May 23, 2019); *see also D.C. Mason Builders, Inc. v. Bancroft Const. Co.*, 2015 WL 4040415, at *5 (D. Md. June 30, 2015) (quoting *Blondell v. Littlepage*, 413 Md. 96, 125 (2010)).  Although tortious interference with contract and tortious interference with economic relations "share an underlying rationale . . . they differ in their tolerance of interference."  *Macklin*, 334 Md. 287 at 298.  Where the alleged interference is merely with economic relations not involving a contract, third parties enjoy a broader right to interfere.  *Id.* ("A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved.").  As such, to demonstrate wrongful interference with economic relations, a plaintiff must show "conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships."  *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 271 (Md. 1994).  This conduct may include "common law torts and 'violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.'"  *Id*. (quoting *K&K Management v. Lee*, 316 Md. 137, 166 (1989) (internal quotation marks omitted)).

As an initial matter, the parties dispute whether KG Tile may maintain a claim for tortious interference with prospective contractual relations, in light of its claim in Count I for tortious interference with an existing contract.  Summitville, citing the honorable Judge Bredar's recent

decision in *C&R Caulking, LLC v. Bank of America, N.A.*, argues that "Maryland's alternative theories of tortious interference are 'mutually exclusive.'"  ECF 38-1 at 22 (quoting 2021 WL 2661875 at *6 (D. Md. June 29, 2021) ("[U]nder Maryland law, tortious interference comprises a 'single tort that encompasses not only that form of tortious interference with a contract exemplified by wrongful inducement of a breach of contract, but also the broader form that encompasses other sorts of wrongful interference with contractual relations.'") (internal citations omitted)).  KG Tile, in response, contends that *C&R Caulking*'s holding is distinguishable from the instant case.  ECF 40-1 at 32 ("Unlike *C&R Caulking*, Summitville's interference in this case affected both existing contracts between KG Tile and Firvida and Bratti, and prospective contracts that KG Tile would have entered with Firvida, Bratti, and others had Summitville not acted as it did.").  This Court finds it unnecessary to resolve the parties' competing interpretations of Maryland law because, even assuming Count II is not duplicative, it still fails to survive summary judgment.

KG Tile contends that Summitville employed "independently wrongful or unlawful conduct," namely "the false and defamatory statements it made to Bratti, Firvida, and Kiewit," to wrongfully interfere with "its reasonably anticipated future distribution contracts with Firvida, Bratti, and others for the WMATA Project."  ECF 40-1 at 34.  Even viewed in the light most favorable to it, KG Tile's argument cannot withstand scrutiny.  Assuming without deciding that Summitville's email communications to Bratti, Firvida, and Kiewit were "false and defamatory,"[13] there is still no basis to suggest that this interference caused the injury of which KG Tile now complains.  *Id.*  Put differently, there is no evidence indicating that KG Tile's prospective future business was harmed due to Summitville's allegedly defamatory statements, and not—as the facts

---

[13] This Court expresses no view on the merits of KG Tile's claim for defamation in Count III, on which neither party has moved for summary judgment.

suggest—because KG Tile could no longer supply Summitville tile products.  Indeed, an affidavit executed by Firvida and offered by KG Tile confirms as much.  *See* ECF 40-1 at 34 ("Firvida would have placed purchase orders with KG Tile to supply Summitville's tile on subsequent phases of the WMATA Project in which Firvida was involved *if KG Tile could have secured tile from Summitville*." (quoting ECF 40-9 ¶ 17) (emphasis added)); *see also* ECF 40-3 ¶ 14 ("Kiewit intended to continue ordering *Summitville manufactured tile* through KG Tile for the rest of the WMATA project") (emphasis added).  Simply put, Summitville's decision to stop doing business with KG Tile effectively foreclosed its prospects for future contracts with Firvida and Bratti.  KG Tile offers no facts to suggest that Summitville's decision to terminate the parties' relationship is "independently wrongful or unlawful," nor does any appear from the record.  *Alexander & Alexander, Inc.*, 650 A.2d at 271.  Irrespective of whether Summitville had a legal justification to cancel the existing Mezzanine Phase Purchase Orders, it remains wholly within its purview to refuse to work with KG Tile in the future.  The fact that Summitville's apparent decision to do so interfered with KG Tile's expectations of subsequent purchase orders from third parties does not render it tortious.

## IV.  CONCLUSION

For the reasons set forth above, Summitville's Motion for Partial Summary Judgment, ECF 38, is DENIED as to Count I and GRANTED as to Count II; KG Tile's Motion for Partial Summary Judgment, ECF 40, is DENIED.  A separate Order follows.


Dated:  February 11, 2022                              _____/s/_____
                                                       Stephanie A. Gallagher
                                                       United States District Judge